FILED

08/04/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0763

DA 25-0763

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 178N

IN RE THE MARRIAGE OF:

ACACIA JENSEN,

       Petitioner and Appellant,

  and

TIMOTHY JENSEN,

       Respondent and Appellee.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-21-635
Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Marybeth M. Sampsel, Measure Law, PC, Kalispell, Montana

      For Appellee:

          Timothy Jensen, Self-Represented, Missoula, Montana

Submitted on Briefs: July 15, 2026

Decided:  August 4, 2026

Filed:

                                                        Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Acacia Jensen, n/k/a Alihana Malakai, (Alihana) appeals from the October 1, 2025 Order of the Fourth Judicial District Court, Missoula County, amending the Final Parenting Plan of June 30, 2023. We affirm.

¶3 Timothy Jensen (Tim) and Alihana were married for 14 years and had three children (M.J., L.J., and C.J.) together before separating in April 2021. Alihana filed a Petition for Dissolution of Marriage and Proposed Interim Parenting Plan in September 2021. Tim responded with his own parenting plan proposal. Alihana and Tim had developed significantly different child-rearing philosophies. While both parties agreed that the other was a "fit and proper parent," they heavily disagreed on aspects of parenting time, discipline, diet, medical care, visitation with other family members, spirituality, and schooling. Both parents asserted that the other's parenting style was not in the children's best interests.

¶4 On June 30, 2023, the District Court dissolved the marriage and entered a Findings of Fact and Conclusions of Law, and Final Decree of Dissolution (June 2023 Findings of Fact) and a Final Parenting Plan (Original Plan). Relevant here, the Original Plan granted Tim final decision-making authority in matters of school selection and healthcare and

2

prevented Alihana from exposing the children to prayer or meditation practices associated with Liana Shanti or the Lemurian Mystery School.[1]

¶5  Both parents continued to accuse one another of failing to follow the Original Plan in various ways: Tim accused Alihana of allowing excessive tardiness and absences from school and continuing to expose the children to Liana Shanti's teachings, while Alihana countered that Tim froze her out of medical decision-making and allowed the children to have unsupervised contact with the maternal grandparents.  Both parents also accused the other of engaging in harassing behavior.  Tim filed a Motion to Amend the Final Parenting Plan in January 2025, where he requested the court designate him as the primary parent or, in the alternative, appoint a guardian to oversee the administration of the plan.

¶6  Following a May 1, 2025 hearing on Tim's motion, the court issued the First Amended Final Parenting Plan (Amended Plan) and an accompanying Memorandum of explanation on October 1, 2025.  Relevant changes made to the Original Plan consisted of (1) the appointment of a Parenting Plan Supervisor as "first line" dispute resolution; (2) a provision that the children no longer be "influenced" by Liana Shanti or the Lemurian Mystery School, specifically barring the children from using any nicknames associated with such; and (3) a provision that, in the event the parents cannot agree on medical

---

[1] Liana Shanti is an online based "spiritual teacher and mentor."  She promotes a strict raw-vegan diet, meditation routine, and the recovery of suppressed memories.  Shanti leads the Lemurian Mystery School, a group who believe that they can recover memories from their previous lives on a lost continent called Lemuria.  Followers of Shanti eschew traditional in-school education and aspects of "western" medicine, including vaccinations.  Alihana became a follower of Shanti in 2020; Tim characterized the group as a "cult."  Much of the conflict in this case stems from Alihana's adherence to, and Tim's dismissal of, the tenets of Shanti.

treatment, they must follow the recommendations of the treatment provider. Crucially, the District Court did not issue explicit Findings of Fact and Conclusions of Law accompanying the Plan; rather, it only "incorporate[d] by reference the prior Findings of Fact and Conclusion of Law . . . as well as the oral findings made by the [c]ourt at the May 1, 2025 hearing" in the Memorandum. The Memorandum was sparsely written, did not address the nickname provision, and only scantly provided the court's rationale for the supervisor and medical-treatment provisions. Alihana now appeals.

¶7 Alihana raises four issues on appeal. First, she argues that the findings of fact necessary to amend a parenting plan did not take place, and that the Memorandum itself did not constitute a sufficient finding of fact. Second, she claims that the provision banning nicknames harms her child, and the ban on exposing the children to the teachings of Liana Shanti infringes on her First Amendment and fundamental parenting rights. Third, she asserts that the District Court erred in appointing a Parenting Plan Supervisor with enforcement authority and in ordering that the recommendations of medical treatment providers be followed should the parents fail to agree. Finally, Alihana argues that her procedural due process rights were infringed upon during the May 1 hearing. We address each of these issues in turn.

**Insufficient Findings of Fact**

¶8 When the allegation is made that no requisite findings of fact were ever made prior to the modification of a parenting plan, a question of law is implicated and the review standard becomes de novo for the issue. *Jacobsen v. Thomas* (*Jacobsen II*), 2006 MT 212, ¶ 13, 333 Mont. 323, 142 P.3d 859.

4

¶9      Alihana contends that the District Court failed to make the statutory findings to justify amending a parenting plan under § 40-4-219, MCA, because the court did not issue findings of fact with the Amended Plan, the Memorandum accompanying the Amended Plan did not explicitly state a change in circumstances had occurred, and the incorporation by reference of the June 2023 Findings of Fact into the Memorandum addresses different issues.

¶10     Section 40-4-219(1), MCA, provides:

> The court may in its discretion amend a prior parenting plan if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child.

The district court must find that there was a change in circumstances and that amendment is necessary for the best interests of the children for amendment of a parenting plan to be proper.

¶11     We presume that a district court's determinations are correct, and we must make any reasonable inferences necessary to support that presumption. *Sayler v. Sun,* 2023 MT 175, ¶ 43, 413 Mont. 303, 536 P.3d 399. Therefore, "any specific finding of fact not expressly made, but necessary to prove an essential element of a claim or defense at issue, is implied if supported by the record evidence and the implied finding is not inconsistent with any express finding that is not clearly erroneous." *Sayler* ¶ 43. This is called the doctrine of implied findings. In *Jacobsen v. Thomas (Jacobsen I),* 2004 MT 273, 323 Mont. 183, 100 P.3d 106, we determined that although "the court did not use the change of circumstances language," comments made by the court "that '[t]he level of

conflict between the parties had increased to the level that they were only able to resolve issues concerning visitation through . . . mediation[,]'" implicitly contained findings "that substantial change occurred in the circumstances and this change significantly affected the children because the parties were unable to follow the stipulated plans." *Jacobsen I,* ¶ 44.

¶12 The instant case is analogous to *Jacobsen I.* Here, the District Court noted in its Memorandum the presence of "ongoing issues" and "conflict" between the parents. This language parallels language in *Jacobsen I* in that it implicitly indicates a change in circumstances has occurred and that making an amendment to a parenting plan is in the best interests of the children, despite the omission of the specific "change of circumstances" language. *Jacobsen I,* ¶ 44. In contrast, Alihana relies on *Jacobsen II,* where we reversed the amendment of a parenting plan on the grounds that the court "did not take any testimony, receive any evidence, or hear any arguments at the . . . hearing." *Jacobsen II,* ¶ 15. The order issuing the amended parenting plan there made no reference to *any* facts from which inferences could be drawn, and was not accompanied by a Findings of Fact, nor an explanatory memorandum. *Jacobsen II,* ¶ 18. *Jacobsen II* is distinguishable from the instant case because the existence of the Memorandum and incorporation of the hearing record here serve as a basis from which the necessary facts can be inferred. The order in *Jacobsen II* had no foundation from which to draw any facts at all.

¶13 Alihana argues that the incorporation of the June 2023 Findings of Fact into the Memorandum is problematic because "those findings addressed different issues and cannot support the new modifications[.]" This argument supports a finding that a change in circumstances has occurred. If the June 2023 Findings of Fact address wholly different

6

issues than the Amended Plan, it is because the instant issues did not exist in June 2023 but did exist in 2025. It is irrelevant if the earlier findings cannot support the Amended Plan, as the difference in issues addressed implies a finding that circumstances in 2025 have changed from what they were in 2023.

¶14 We conclude that the District Court met the statutory requirements for modifying a parenting plan.

¶15 Alihana asserts not just that the factual finding required to justify the modification of the parenting plan did not take place, but also that individual provisions of the plan lack requisite findings to justify those specific provisions.

¶16 We review the findings of facts justifying a modification of a parenting plan for clear error. When no such error exists, we only reverse the District Court's amendments upon clear demonstration of abuse of discretion. *In re Marriage of Oehlke*, 2002 MT 79, ¶ 9, 309 Mont. 254, 46 P.3d 49. Absent a showing of clear error, we defer to a district court's conclusions regarding those facts, as it "has broad discretion when considering the parenting of a child, and we must presume the court carefully considered the evidence and made the correct decision." *In re Parenting of C.J.*, 2016 MT 93, ¶ 13, 383 Mont. 197, 369 P.3d 1028 (quoting *In re Marriage of Woerner*, 2014 MT 134, ¶ 12, 375 Mont. 153, 325 P.3d 1244). As "otherwise facially insufficient findings of fact may be minimally sufficient if . . . [they] can be clearly inferred from other express findings or the evidentiary record," the incorporation by reference to "oral findings" at the May 1 hearing is sufficient to allow inference of findings in support of the discrete plan amendments. *In re D.L.B.*, 2017 MT 106, ¶ 13, 387 Mont. 323, 394 P.3d 169. A parenting plan must be determined

7

according to the best interests of the child and, "while a court must consider [the statutory factors as listed in § 40-4-212(1), MCA], it is not required to enter specific findings related to each." *In re Parenting of M.C.,* 2015 MT 57, ¶ 15, 378 Mont. 305, 343 P.3d 569. Despite the bare-bones nature of the Memorandum, we have previously held that "if a trial judge's findings and conclusions are clear to this Court, failure to state them in the recommended form is not substantial error." *In re Marriage of Bartsch,* 2007 MT 136, ¶ 18, 337 Mont. 386, 162 P.3d 72.

¶17 For Alihana's challenge against the individual plan provisions to succeed, she would have needed to show that a finding was clearly erroneous, even if that finding was only implied by the evidentiary record. As her general position throughout her argument is that there are no findings at all which support the ways in which the plan was amended, she has failed to address why the evidence in the record does not support the District Court's conclusions.[2] Because Alihana did not demonstrate why the District Court's findings are erroneous, we presume here that the determinations of the District Court are correct and supported by the implicit findings in the evidentiary record.

¶18 We conclude that the District Court made sufficient implied findings as to a change in circumstance and plan amendment being in the best interest of the children, as evidenced through its October 1 Memorandum.

---

[2] Alihana does make one affirmative claim of clear error in fact-finding regarding the restriction on nickname use for her children, which is addressed below.

**Restriction on Child's Nickname and Infringement on Rights**

¶19 Alihana argues that the District Court erred when it restricted the use of nicknames for her children. She asserts that the restriction harms her child on the grounds that the child requested the name for herself, and because the child stated that she "feels like she's two different people . . . one person with my mom and one person elsewhere." She further argues that the nickname is not associated with the Lemurian Mystery School or Liana Shanti, and that the broader restriction on being "influenced by—including names and nicknames—the teachings of Liana Shanti, the Lemurian Mystery School, or associated practitioners" is a violation of both her First Amendment rights and her fundamental parental rights under Montana law.

¶20 We address the error argument first. Montana law encourages the court to consider the wishes of the child when creating or amending a parenting plan, though the wishes of the child are not dispositive. *In re Marriage of Williams,* 2018 MT 221, ¶ 19, 392 Mont. 484, 425 P.3d 1277. Section 40-4-212(1), MCA, contemplates that "[t]he court shall determine the parenting plan in accordance with the best interest of the child" and "shall consider all relevant parenting factors, which *may* include . . . the wishes of the child." (Emphasis added.) In *Marriage of Williams*, we concluded that the district court did not err in creating a parenting plan which gave primary custody to the children's father, despite the children sharing a closer bond with and professing a wish to remain with the mother, on the grounds that other factors listed in § 40-4-212, MCA, outweighed the children's stated interests. *Marriage of Williams,* ¶ 19. Although Alihana's child might have selected the nickname for herself, that fact is not sufficiently dispositive in showing the nickname

9

restriction is clearly erroneous. The statement from the child that she "feels like two different people," too, does not plainly manifest the "psychological harm" which Alihana argues it does; to determine such requires additional evidentiary context which the District Court is in the best position to possess. *In re A.F. and A.C.*, 2003 MT 254, ¶ 24, 317 Mont. 367, 77 P.3d 266. As it is "not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court," we determine that the District Court did not err in amending the Plan contrary to the wishes of Alihana's child. *In re A.F.*, ¶ 24.

¶21 We turn now to the claim that the nickname restriction violated Alihana's First Amendment and fundamental parenting rights.

¶22 We exercise plenary review of constitutional issues. *In re Marriage of Stevens*, 2011 MT 124, ¶ 13, 360 Mont. 494, 255 P.3d 154. A parent has a "fundamental liberty interest in the care, custody, and management of a child." *In re D.B.J.*, 2012 MT 220, ¶ 28, 366 Mont. 320, 286 P.3d 1201. However, the fundamental rights of a parent may be narrowly limited if the court determines that the best interests of the child are served by such a limitation. *In re M.C.*, ¶ 21.

¶23 Here, the Amended Plan does not restrict Alihana's ability to hold or express her own personal spiritual beliefs. However, the Amended Plan undeniably curtails Alihana's fundamental parental right to share those spiritual beliefs with her children. The Original Plan contained a provision similar to the "influence" provision in the Amended Plan which prevented the children from listening to "recorded meditations or prayers based on the teachings of Liana Shanti," which is supported by the incorporated June 2023 Findings of

10

Fact. These findings include, among others, that "[Alihana] is an ardent follower of Ms. Shanti"; that "Ms. Shanti's followers have a higher preponderance of suppressed memories and family systems with hallmarks of cult indicators (Behavior, Information, Thought, and Emotional Control)"; that "Ms. Shanti's followers have a high preponderance of claims against their spouses for abuse"; and that the children need "a neutral environment that allows them to develop autonomous analytical skills and time away from the divergent ideological beliefs held by each parent," as well as the determination that Alihana's allegations of violent and abusive behavior on the part of Tim have been repeatedly unsubstantiated. The transcript of the May 1 hearing indicates that Alihana has continued to make unsubstantiated claims of child abuse against various parties, and that the District Court has concerns about Alihana's decision making and "concerns about involving the children in [Alihana's belief system]."

¶24 Alihana's argument about spirituality and nickname use contradicts itself. On one hand, she purports that the child's selected nickname is not associated with Liana Shanti, but on the other she claims the prohibition violates her right to share her spiritual views with her children. If the nickname has nothing to do with Shanti, then the restriction should not infringe on her right to share her spiritual views. In the alternative, if the nickname does have an association with Shanti, then the curtailment of use is clearly implicated by the broader restriction on "influence" by Shanti or the Lemurian Mystery School.

¶25 Consistent with the District Court's earlier findings, the evidentiary record persuades us that curtailing the influence of Liana Shanti and the Lemurian Mystery School maintains the best interest of the children, and that the prevention of nickname use serves

11

to curtail that influence. The provision is narrowly tailored to affect only the children and not impose limits on Alihana's personal spiritual beliefs. We conclude that the District Court did not infringe upon Alihana's First Amendment or fundamental parenting rights when it added the prohibitionary provision to the Amended Plan.

¶26 The Dissent maintains that the restrictions on Alihana's ability to use religious nicknames for her children and expose them to her religious teaching violates her fundamental right to practice her faith. However, aside from the fact that these restrictions are waived because they were ordered in a prior parenting plan that was not appealed, the Dissent is simply wrong that a parent may practice and teach their religion to their children regardless of the harm it inflicts upon them. *In re M.C.,* ¶ 21. First, the District Court amended the parenting plan in response to Tim's request that Alihana be held in contempt for failing to abide by the Original Plan or, alternatively, that the parenting plan be amended to make Tim the primary provider. In response to Tim, Alihana requested a "continuance," a "clarification," and in-camera interviews of two of the children. She also raised an objection to the financial distribution ordered pursuant to their dissolution. At no point did she raise a First Amendment argument or revisit the issue of being restrained from teaching or influencing the children by Shanti or the Lemurian Mystery School under the Original Plan. Thus, the District Court's resuscitation and incorporation of the prior parenting plan's unobjected-to provisions does not preserve the matter for appellate review. *Adgerson v. State,* 2003 MT 284, ¶ 12, 318 Mont. 22, 78 P.3d 850 ("The rule is well established that this Court will not address an issue raised for the first time on appeal.").

¶27 Second, significant evidence exists in the record to imply a finding that continued exposure of the Jensen children to the teachings of Liana Shanti is harmful. Followers of Liana Shanti exhibit a significantly higher-than-average incidence of the recovery of "suppressed memories," which corresponds to a significantly higher-than-average rate of accusations of abuse against spouses and family members. Liana Shanti is a self-described spiritual advisor who offers downloadable audio courses for sale to her followers. Tim offers, through an exhibit attached to his affidavit, that these courses maintain a consistent through-line of encouraging listeners to uncover "repressed memories" of abuse ("traumas of your inner child") and to isolate themselves from family and others who are "toxic." Shanti is known to readily inform followers as to the details of both their own and their children's repressed memories of sexual abuse, under the auspices that she can access "Akashic records" of all the information in the universe. Alihana's on-record behavior corresponds with such a pattern, as she has repeatedly accused Tim and her own parents of abusive behavior. Psychological experts and Child Protective Services (CPS) discovered no evidence of abuse, and the court found the accusations meritless. Alihana has a pattern of refusing court-appointed experts and CPS access to her children. Teachings that promote the "recollection" of abuse by caregivers cannot be said to be in the best interest of a child, as they can result in either the child creating false memories of abuse at the hands of loved ones or being falsely taught that their loved ones are abusers to be avoided.

¶28 In the prior parenting plan proceeding, the District Court, in order to obtain recommendations on how to best construct the Original Plan, ordered a psychological evaluation of Tim, Alihana, and the children, which was completed by Dr. Sara Boilen and

13

filed with the court. According to Dr. Boilen's report, Alihana and Tim Jensen appeared to share a stable marriage until the spring of 2020. During the height of COVID-19 lockdowns, Alihana began to feel unhappy in the marriage and sought support online. She discovered Liana Shanti and the Lemurian Mystery School. Dr. Boilen noted that Alihana "began perceiving her life differently than previously and began to conceptualize herself as an abused woman who was being treated unjustly by her abusive husband." She initiated a divorce from Tim and began making "allegations that Tim is violent and abusive." Alihana additionally began to accuse her father of sexually abusing her during her childhood and her mother of complicity in that abuse. Alihana severed all contact between her parents and her children.

¶29    A psychological evaluation of Alihana's parents,[3] completed by Dr. Eric Frazier and filed with the District Court on March 7, 2024, states that Shanti "has been named and written about as a person who brainwashes people into believing traumatic events occurred in their lives, specifically abusive ones that were never proven to have occurred."

¶30    Despite Alihana's repeated assertions to the contrary, the District Court found that "Alihana's [abuse] allegations were reviewed by law enforcement and child and family services and ultimately found to be unsubstantiated." The court further indicated that "[at] a hearing on interim parenting issues, it did not make any findings that Tim was unsafe or

---

[3] This evaluation was conducted when Tim and Alihana's parents petitioned the court to reverse the ban on communication and visitation between the maternal grandparents and the grandchildren, which the District Court had initially imposed after Alihana's allegations of sexual abuse.

14

unfit to parent, and the parties were able to reach a stipulated agreement regarding interim parenting." Dr. Boilen's psychological evaluation of Tim reported that:

> Timothy's personality is measured and calm. He has little to no tendency toward aggression nor does he have a tendency to act out. He also has a low propensity for dominance. In fact, Timothy's profile is that of a passive and submissive person who doesn't like to be in charge and gives into others easily. It is not particularly akin to a person who is a long term abuser of his partner in a coercive controlling relationship.

. . .

> Alihana was not restricted in her relationships external to the marriage, there was no sexual coercion or control, nor was there heightened levels of jealousy, possessiveness, or preoccupation with Alihana on Timothy's behalf. Further, Alihana made most of the decisions, especially those concerning the children, and there was no evidence that Timothy was abusive toward her psychologically. Finally, Timothy's profile is inconsistent with the typical pattern of being in contempt of, or disregarding, authority.

¶31 Dr. Boilen's report that Tim's psychological profile does not match that of an abuser is paralleled in the psychological evaluation of Alihana's parents by Dr. Frazier. Dr. Frazier concluded that "[a]fter taking the totality of the data together, it is my opinion that [Alihana's father] did not sexually abuse Alihana and there is no data showing he poses a risk of future sexual abuse." Dr. Frazier further wrote:

> There is a substantial body of research by psychologists who have published numerous studies about memory, allegations of sexual abuse and children's memory, and the delayed resurfacing of memories of child abuse when they are older. The overall consensus of researchers in this field is that it is basically "unlikely" for children aged two or three to have any memories at or before that age. This is referred to as childhood amnesia. This scientifically discredits the accuracy of Alihana's 'memory' of being sexually abused at that young age. The absence of detailed contextual information pertaining to her sexual abuse allegations when she was of an older age, and her rationale to permit her parents' access to her children because she did not remember "all" the abuse, is also inconsistent with true abuse victimization. I offer these opinions based on my professional

15

experience interviewing many children of all ages who have made allegations of sexual abuse, staying current on that particular area of research, and also reviewing many recorded forensic interviews of children making disclosures of sexual abuse. I do my absolute best to be objective on this (and all) professional subject matters, and sometimes conclude that it occurred, sometimes that it did not, and sometimes no conclusion can be made. Again, looking at her father's psychological data, there are no risk factors consistent with sexually abusive behavior.

¶32 The evidence in the record makes it clear that Liana Shanti and her group are known to encourage followers to discover and act upon false "repressed memories" of abuse. Once these false abusive memories are uncovered, followers are encouraged to sever ties with family and friends and become more closely involved in the group. Here, a preponderance of evidence shows that Alihana has engaged in embracing false memories of abuse. She has repeatedly accused Tim and her parents of abusive behavior for which no evidence exists. Notably, CPS investigators have described these accusations as unfounded. Psychological evaluators also believed the accusations were highly unlikely to have occurred. Dr. Boilen's report indicated that she has "concerns about Alihana's psychological wellbeing and her capacity to accurately perceive the world and in turn the needs of her children," and "expresse[s] specific concern that Alihana is not thinking for herself."

¶33 At the time the Original Plan was written, the District Court was already concerned that Alihana's worldview was leading her to inadvertently harm her children through isolation. In the evaluation of Tim and Alihana, Dr. Boilen wrote that the children "went from having many close, caring adult figures in their lives to having few, particularly when they are in their mom's home." Dr. Boilen continues:

16

Alihana appears to be perpetuating this dynamic by engaging in some gatekeeping behaviors. I witnessed the gatekeeping first hand. On three occasions, Alihana stifled my attempts at accessing the children and their world. First, she had [L.J.] stay home from school for a stomach ache when he was meant to visit with me. Second, she failed to allow my access to the school professionals in a timely manner. Third, when I arranged for the children to meet in my office, and to have them left alone with me while the parents did an exchange, Alihana rearranged the plan by explaining that "the children aren't comfortable staying with someone they don't know," attempting to make it impossible for me to observe the transitions that I needed to observe. She acquiesced when I explained that it was a necessary component of the evaluation. The children were unphased by her departure from the room during the observation. She is certainly gatekeeping Timothy's time and engagement with his children and has forbid her parents from having contact with the children. Alihana reportedly forbade vaccinated individuals from being around her children, including Timothy's parents. Additionally, other sources have cited that Alihana has removed the children from some of their friends' lives following the divorce. The children's worlds have shrunk with Alihana at the helm.

¶34 Allegations that Alihana is involving the children in creating their own unsubstantiated memories of abuse exist in the record. In his affidavit accompanying the Motion to Amend Parenting Plan, Tim alleges that in October 2024, Alihana brought their (then 5 years old) child C.J. to First Step, a sexual abuse resource center at Providence St. Patrick Hospital in Missoula, alleging that C.J.'s older stepbrother R.A.L.R. had inappropriately touched C.J. First Step ultimately concluded that no inappropriate touching had occurred. Tim also alleges that L.J. told him that Alihana had discussed with L.J. and M.J. a plan to write a letter to a neighbor in which the children would assert that they were being inappropriately touched. Tim's wife, Courtney, in a sworn affidavit, asserted that Alihana made a false allegation to Missoula Police that Courtney had threatened to kill Alihana, which the police found to be unsubstantiated. Courtney asserts that "Alihana is responsible for planting the idea in M.J.'s, L.J.'s, and C.J.'s minds that R.A.L.R. could be

sexually abusing them." Such behavior comports with the pattern of creation and weaponization of false memories by followers of Liana Shanti. The District Court evidently found some core of truth in these allegations, as it explicitly added language into the Amended Plan that "if Alihana calls the police on Tim, his family, and/or the children . . . and if the police respond and determine that no cause exists for further investigation, Alihana will be sanctioned[.]"

¶35 While the District Court does not explicitly state that spiritual teachings which encourage the "discovery" of memories of abuse at the hands of loved ones is harmful to children, it is plainly evident why such behaviors are harmful. Especially when a child is told by a trusted caregiver or spiritual leader that they have been abused when they were not, they internalize the trauma of abuse which never happened and consequently suffer psychological harm. This is not to mention the additional trauma inflicted upon a young child when that child is forced to reconcile events which a parent asserts happened with their own, differing memory. What results is fear of the outside world and isolation from not just their own family but from a wider potential supportive community. While it is a constitutional right of a parent to provide spiritual education and teaching to their child, it is not the right of a parent to inflict abusive memories upon their child, be those memories fictional or actual. This Court would never hold, for example, that it is in the best interest of a child to be exposed to teachings which encourage actual sexual abuse by an adult. It cannot hold, then, that it is the constitutional right of a parent to expose their children to fictionalized sexual abuse.

18

¶36    Additionally, Shanti and her followers have a habit of sharing the private details of their ongoing legal and domestic issues on public Facebook pages. Shanti, throughout the course of this case, has posted intimate details of the case to this page, including the full names of Tim and the children, Tim's mugshot, and multiple unfounded allegations of Tim as a sexual, emotional, and physical abuser.

¶37    It is clearly against the best interest of the children to have details of their parent's divorce and false accusations of abuse shared with the public under the guise of "spiritual teachings." Because of the decentralized and online nature of Liana Shanti's group, and because much of Shanti's communication with her followers is conducted through Facebook and website postings, it is difficult if not impossible to separate the personal opinions of Shanti from spiritual guidance. (Compare a pastor at the pulpit—it would be easy to conflate the pastor's personal beliefs with his spiritual guidance if he provided both, without differentiation, while leading prayer.) As a result, it is highly likely that if the children engage with the spiritual teachings of Liana Shanti through her Facebook posts, they will encounter material in which sensitive details of their parent's divorce and their own lives are discussed by their mother's spiritual leader. Beyond this, they would see material disparaging their father as a rapist and abuser written by a person they know to be highly influential upon and important to their mother.

¶38    It is undisputed that a restriction on constitutional free speech is acceptable in a parenting plan when the purpose is to "promote a healthy, beneficial relationship between the children and the other parent," and the restriction is that the parent "will not demean or speak or act out negatively in any manner that would damage the natural flow of love and

19

caring between the other parent and the minor children," as is written into the Amended Plan. Such a provision is meaningless if a parent is allowed to denigrate the other so long as it flows through a third party, even if that third party is doing so under the guise of spiritual leadership. In this case, Liana Shanti's Facebook postings are clearly disparaging of Tim and not meaningfully differentiated from her regular spiritual postings. When spiritual teachings are entangled with behavior that both parties stipulate is harmful to the children, there is no particular way to mitigate that harm while still allowing the children to engage with those spiritual teachings.

¶39 The Dissent appears to suggest that, when a parent's spiritual beliefs are at odds with the best interests of the child, the proper remedy is to remove the child entirely from that parent's care. Here, the District Court instead fashioned a parenting plan that allowed Alihana to continue to remain in the children's lives but protected them from emotional and mental harm that was not in their best interests. Without the restriction imposed by the District Court, Alihana would be forced to choose between giving up her faith or giving up her children. Further, the District Court was concerned about protecting the best interests of the child, not protecting "an obscure minority faith" outside of "the mainstream systems of belief." This Court similarly must remain guided by the best interests of the child; this case is not about Alihana's fundamental right to practice her religion—it *is* about protecting her children from the emotional harm of having false memories of abuse about their father and other family members interjected into their psyche.

¶40 Thus, even though improper to address at this juncture of the proceedings, we reject the Dissent's argument that the District Court improperly limited Alihana's First

20

Amendment rights. The District Court did not abuse its discretion in restricting Alihana from exposing the Jensen children to the teachings of Liana Shanti in the Amended Plan because there was overwhelming evidence in the record that this exposure was harmful to the children.

**Appointment of Parenting Plan Supervisor and Treatment Authority**

¶41 Alihana next argues that the District Court erred in ordering that the recommendation of the medical treatment provider be followed in the event the parents disagree on the proper course of treatment. She asserts that the District Court lacked sufficient findings to justify these provisions; however, as discussed above, we have addressed this argument. She also contends that these provisions improperly transfer judicial authority to private parties. We are unpersuaded by this contention.

¶42 A district court's grant of judicial authority involves an issue of law and, therefore, is reviewed de novo for correctness. *Jacobsen v. Allstate*, 2013 MT 244, ¶ 25, 371 Mont. 393, 310 P.3d 452.

¶43 The recommended treatment provision within the plan does not impart judicial authority on healthcare providers to make decisions on behalf of the parents, because the Amended Plan also prevents Alihana from making non-emergency medical appointments for the children. As such, Tim is granted de facto decision-making authority concerning medical treatment, as he is the only one empowered to choose which medical provider is used. The provision, therefore, does not vest decision-making authority in medical care providers, but properly in Tim. As written, the provision clarifies that Alihana must abide

by the recommendations of the healthcare providers Tim has selected, even if she disagrees with those recommendations.

¶44 Likewise, Alihana mischaracterizes the appointment of the Parenting Plan Supervisor as a transfer of judicial power, where none exists. The Supervisor is given no authority to modify the plan nor compel any of the parties to the plan to take any actions, but merely to interpret the plan and determine if an alleged violation has taken place. The Supervisor may impose sanctions, but these sanctions are defined and imposed by the plan itself under the color of the authority of the District Court.

¶45 We conclude that there was no improper transfer of judicial authority to medical treatment providers in the Amended Plan.

**Due Process at Hearing**

¶46 Finally, Alihana alleges that her due process rights were violated at the May 1, 2025 hearing. She claims that the district court improperly cut short her cross-examination of Tim, refused to grant her more time to present her evidence, and refused to hear witnesses and enter exhibits, and therefore abused its discretion. Further, Alihana argues that she should be granted more latitude in these issues because she represented herself pro se during the hearing.

¶47 We exercise plenary review of constitutional issues. *Marriage of Stevens*, ¶ 13. Due Process entails "notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Marriage of Stevens,* ¶ 18 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976)). Due process has been afforded if a party has been given notice of a proceeding and that proceeding takes place, regardless of whether that

party took advantage of the opportunity to be heard at the proceeding. *In re Marriage of Fishbaugh,* 2002 MT 175, ¶ 15, 310 Mont. 519, 52 P.3d 395; *In re Marriage of Robbins,* 219 Mont. 130, 138, 711 P.2d 1347, 1352 (1985); *Bardsley v. Pluger,* 2015 MT 301, ¶ 15, 381 Mont. 284, 358 P.3d 907.

¶48 Here, both parties were present at a March 25 scheduling conference, at which they received notice a hearing would take place on May 1. That hearing did take place with both parties in attendance. The transcript of the hearing makes clear both Alihana and Tim testified and presented evidence. Alihana had notice of the proceeding at which she had a meaningful opportunity to be heard, and thus the requirements for due process have been met. Further, upon review of the transcript, we are convinced that Alihana was able to present her case to the District Court unimpeded; the court only attempted to direct Alihana to issues that were of relevance and of concern.

¶49 M. R. Civ. P. 16(c)(2) contemplates that during a pretrial hearing, the court may "consider and take appropriate action" for the sake of "avoiding unnecessary proof and cumulative evidence, and limiting testimony" as well as "establishing a reasonable limit on the time allowed to present evidence." The district court is afforded wide latitude in its management of administrative matters and is in the best position to determine fair and efficient procedures with which to conduct the case; allegations that the district court has exceeded its authority in these matters are handled with an abuse of discretion standard. *Allstate*, ¶ 25.

¶50 Because Alihana was not afforded all the time that she wished for at the hearing does not amount to an abuse of discretion by the District Court. When it became apparent

that time was running short during Alihana's cross-examination of Tim, the court notified her of such and gave her an opportunity to summarize the nature of her remaining evidence, before then having Alihana directly testify. It is within a court's power to control its docket and trial under M. R. Civ. P. 16(c)(2). The District Court made several comments alluding to its impression that Alihana's cross-examination was duplicative. Accordingly, we conclude the court did not abuse its discretion in limiting Alihana's cross-examination. For the same reason, it was not an abuse of discretion for the court to decline to schedule a different time to take testimony from a witness who failed to respond to a subpoena, especially when that subpoena was issued by Alihana only the day before the hearing. *Marriage of Fishbaugh,* ¶ 15; *Marriage of Stevens*, ¶ 18.

¶51 Alihana cites *Bardsley* in support of her argument that her due process rights were violated. *Bardsley* is distinguishable because there, no pre-order hearing was held at all, and thus the parties were afforded no opportunity to be heard. *Bardsley,* ¶ 16. Contrarily, in *Marriage of Fishbaugh* we held that no due process violation occurred when the district court failed to grant a continuance because the requesting party had prior notice of the proceeding and an opportunity to be heard. *Marriage of Fishbaugh,* ¶¶ 13, 15. Alihana further cites *In re R.M.T.,* 2011 MT 164, 361 Mont. 159, 256 P.3d 935, as authority that limiting her cross-examination time infringes upon her due process rights, but fails to elucidate and explain that in that case no cross-examination of the opposing party was allowed at all. *In re R.M.T.*, ¶ 48. Alihana has failed to demonstrate that the Court's limitation on duplicative testimony violated her right to due process. We conclude the

24

District Court did not abuse its discretion and correctly concluded that there was no violation of Alihana's due process rights.

¶52 Likewise, Alihana's pro se representation does not mean that she must be afforded special treatment beyond litigants with counsel, or that her due process rights are otherwise different than represented parties. "While pro se litigants may be given a certain amount of latitude, that latitude cannot be so wide as to prejudice the other party, and it is reasonable to expect all litigants, including those acting pro se, to adhere to procedural rules." *Greenup v. Russell,* 2000 MT 154, ¶ 15, 300 Mont. 136, 3 P.3d 124. We will give a pro se litigant some extra leeway, but that extra leeway is not equivalent to an entitlement that requests for extra time be granted.

¶53 We are unpersuaded that Alihana's due process rights were violated because she was granted notice and opportunity to be heard at the May 1 hearing. Further, the District Court did not abuse its discretion in setting limits on trial testimony for the May 1 hearing.

¶54 Accordingly, we conclude that sufficient facts are implied by the Memorandum to meet the statutory requirements of § 40-4-219(1), MCA, and justify amending the Original Plan. These implied facts are likewise sufficient for justification of the specific modifications to the Amended Plan. The District Court did not intrude upon Alihana's First Amendment or fundamental parenting rights by limiting the use of a nickname for Alihana's children, as the rights of a parent may be curtailed when it is in the best interest of the child. Likewise, the District Court did not err in its appointment of a Parenting Plan Supervisor or medical decision-making provision, as these provisions do not transfer judicial authority. Finally, the District Court afforded Alihana her due process rights when

25

it provided her with notice and opportunity to be heard and properly managed its docket during the hearing.

¶55 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶56 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE

Chief Justice Cory J. Swanson, dissenting.

¶57 I dissent from the Court's affirmation of the restriction on Alihana's ability to use religious nicknames for her children and expose them to her religious teachings. This infringes on Alihana's fundamental right to practice her faith. This right is protected by—not conferred by—the First Amendment of the United States Constitution, and Article II, Sections 5 and 7, of the Montana Constitution. Alihana also has a fundamental right as a parent to direct the upbringing of her children. The Court affirms an unconstitutional infringement of that right because it restricts a mother's parental instruction of her children in her religious beliefs, without a documented harm to the child which may justify a

26

restriction. I would reverse the First Amended Parenting Plan and remand it to the District Court to either remove the religious instruction and nickname restrictions, or provide record-based findings that such practice produces documented harm to the children.

¶58 First, I disagree that Alihana has waived all appellate review of the restrictions on her parental rights on this issue. There have been three different parenting plans ordered in this case. The Interim Parenting Plan, issued February 28, 2023, had no mention of Liana Shanti, the Lemurian Mystery School, or either parent's teachings or religious instruction to the children. The Final Parenting Plan, issued June 30, 2023, instructed: "The children shall no longer listen to recorded meditations or prayers based on the teachings of Liana Shanti, the Lemurian Mystery School, or associated practitioners." While this has the markings of a restriction on what Alihana can teach her children, it was more specific and limited than the subsequent order. To the extent she did not appeal from that order, I agree she waived the issue.

¶59 However, the First Amended Parenting Plan, issued October 1, 2025, imposed restrictions beyond the prior order.

> The children shall no longer be exposed to the teachings of Liana Shanti, the Lemurian Mystery School, or associated practitioners. The children shall not be influenced by—including names and nicknames—the teachings of Liana Shanti, the Lemurian Mystery School, or associated practitioners. The children shall be called their given names at birth and shall not be addressed by any name influenced by the teachings of Liana Shanti.

Alihana objected and has appealed the increased restrictions on her free exercise of religion and her parenting rights. She has preserved the appeal and we should entertain it.

27

**Right to Free Exercise of Religion**

¶60     The First Amendment of the United States Constitution prohibits Congress from making laws "prohibiting the free exercise" of religion "or abridging the freedom of speech." Likewise, Article II, Section 5, of the Montana Constitution requires "[t]he state shall make no law . . . prohibiting the free exercise" of religion, and Section 7 provides, "No law shall be passed impairing the freedom of speech or expression."

¶61     The First Amended Final Parenting Plan (the parenting plan) prohibits exposing the children to "the teachings of Liana Shanti, the Lemurian Mystery School, or associated practitioners" including the use of names or nicknames associated with the same. According to the parenting plan, Alihana and Timothy split time with their children. This limitation, which precludes exposure to the teachings of the Lemurian Mystery School, effectively prevents Alihana from practicing the tenets of her faith in front of her children and therefore prevents her from freely exercising her faith for days at a time. Before even addressing the infringement on her parental rights, this parenting plan restricts Alihana's ability to exercise her own religious beliefs whenever the children are with her, thus infringing her own religious rights.

¶62     Additionally, the restrictions in this order are unconstitutional because they prohibit religious teachings, and they are too broad because they do not enable a clear understanding of what exactly is prohibited. The Ohio Supreme Court struck down an order imposing a similar restriction in *Pater v. Pater*, which demanded that the mother "shall not teach or expose the child to the Jehovah[']s Witnesses' beliefs in any form." 588 N.E.2d 794, 801 (Ohio 1992). There, the Court noted, "This order is so broad that it could be construed as

28

forbidding any discussion of the Bible.  It is equally unclear whether [the mother] is permitted to discuss moral values because these values are influenced by religious beliefs." *Pater*, 588 N.E.2d at 801.  Just as in *Pater*, the language in the parenting plan here is overly broad and could even prevent Alihana from teaching her children important moral lessons if she developed them due to the influence of Liana Shanti or the Lemurian Mystery School. We should similarly hold this parenting plan is overly broad and unconstitutionally intrusive.

¶63    It is worth noting the parenting plan singles out a particular faith as offensive and forbidden, thus discriminating against that religion.  Although the Lemurian Mystery school is not a mainstream religion and appears to be controversial, Alihana's right to practice her religion is no less protected.  Had the District Court imposed equivalent restrictions on a parental adherent to Islam, Hinduism, Buddhism, Judaism, or Christianity, we would likely not be having this conversation.  An obscure minority faith—even or perhaps especially with abnormal beliefs—deserves the same legal protections as those mainstream systems of belief.

**Right to Educate Children on Religion**

¶64    We have recognized, "'Parents do have a fundamental right to parent' their children." *State v. Morris*, 2026 MT 143, 429 Mont. 20, __ P.3d __ (quoting *Planned Parenthood v. State*, 2024 MT 178, ¶ 46, 417 Mont. 457, 554 P.3d 153).  And "[i]t is the policy of the state of Montana: (a) to recognize the constitutionally protected rights of parents and the integrity of the family unit." Section 40-4-227(1)(a), MCA.  The Opinion correctly notes "the fundamental rights of a parent may be narrowly limited if the court

29

determines that best interests of the child are served by such a limitation." Opinion ¶ 22. However, the limitation imposed here exceeds that narrow limit and is not grounded in a record-based finding of harm which would justify a restriction.

¶65    Although district courts "have broad discretion when considering the parenting of a child, . . . a district court must determine the parenting plan in accordance with the best interest of the child." *Tubaugh v. Jackson (In re Parenting of C.J.),* 2016 MT 93, ¶ 14, 383 Mont. 197, 369 P.3d 1028 (internal quotations and citations omitted). The best interest of the child is not considered as on a blank slate, nor does the district court have unfettered leeway to determine the child's best interest. The Legislature has enumerated the factors which must be considered along with the best interest of the child in § 40-4-212(1), MCA. Included among these factors are: "(a) the wishes of the child's parent or parents; (b) the wishes of the child; [and] (c) the interaction and interrelationship of the child with the child's parent or parents and siblings." Section 40-4-212(1)(a)–(c), MCA. Here, these factors are in conflict and the court must make a difficult parenting decision. But it must do so within constitutional bounds.

¶66    This parenting plan exceeds those bounds because it unduly burdens Alihana's right to educate her children concerning her religion. *See Wisconsin v. Yoder*, 406 U.S. 205, 233, 92 S. Ct. 1526, 1542 (1972) ("[T]he Court's holding in *Pierce* [*v. Society of Sisters,*] stands as a charter of the rights of parents to direct the religious upbringing of their children.") When a parent's right to the free exercise of religion is considered together with her right to parent her own children, her religious upbringing of her children should not be infringed without a clearly demonstrated harm to the child. *See In re Marriage of*

30

*McSound*, 131 P.3d 1208, 1215 (Colo. Ct. App. 2006) ("A parent's right to determine the religious upbringing of a child derives from the parent's right both to exercise religion freely and to the care, custody, and control of a child." (citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972)). "[M]ost other states have . . . recognized that, absent a clear showing of substantial harm to the child, a parent who does not have decision-making authority with respect to religion nevertheless retains a constitutional right to educate the child in that parent's religion." *In re Marriage of McSound*, 131 P.3d at 1215; *In re Marriage of Murga*, 103 Cal. App. 3d 498 (1980); *Zummo v. Zummo*, 394 Pa. Super. 30, 574 A.2d 1130 (Pa. 1990); *Munoz v. Munoz*, 79 Wn. 2d 810, 489 P.2d 1133 (1971). However, here even though Timothy was not awarded sole decision-making authority over the religious practice of the children, the District Court went further than most other states in stripping Alihana of her right to educate her children on her religion.

¶67    The Utah Supreme Court considered a similar set of facts in *Kingston v. Kingston*, 2022 UT 43, 532 P.3d 958. In *Kingston*, a mother and father grew up in a polygamist religious community called "the Order" and divorced after having several children. *Kingston*, ¶¶ 8–10. After the divorce trial, the court granted the mother sole legal custody partially because the father's "religious practices . . . represent a direct threat of harm to the children." *Kingston*, ¶ 12. "As part of the parenting plan, the court ordered that 'the children shall not be encouraged to adopt the teachings of any religion or be baptized into any religion without the consent of the legal guardian.'" *Kingston*, ¶ 18. On appeal, the Utah Supreme Court overturned the above provision of the parenting plan on grounds that "parents have a fundamental right to encourage their children in the practice of religion"

31

and the award of sole custody to the mother does not rob the father of his right, "but curtails it only to the extent necessary to give [the mother] the authority to make major decisions for the children." *Kingston*, ¶¶ 24, 72.

¶68 Finally, the Opinion affirms the restrictions against the use of children's nicknames associated with the Lemurian Mystery School and Liana Shanti. This is an error because it is merely an illustration of an unconstitutional infringement on Alihana's religious liberty and parental liberty. The limitation is overbroad and the record fails to indicate how the restriction on nicknames is justified by the best interest of the child.

¶69 In this case, Timothy was awarded authority to have the final word on major decisions for the children, including medical decisions,[1] therapy, schooling, and the like. That determination was based on substantial credible evidence, and the court did not abuse its discretion in that respect. But Timothy's primary custody and authority cannot curtail Alihana's right to expose the children to or even encourage the children in religious practice, unless the record demonstrates harm to the children from this teaching.

¶70 In response to this Dissent, the Opinion spends pages reciting Alihana's harmful conduct toward the children, Tim, and other family members, and documenting the harmful conduct of Lemurian Mystery School or Liana Shanti followers. That proves my point. If

---

[1] Due to the ongoing disagreement between the parents as to nearly every aspect of their lives, including the children's medical care, the First Amended Parenting Plan ordered, "If the parents cannot agree on medical or dental decisions, ***they shall follow the recommendations of the treating provider.***" (Emphasis in original.) Alihana argues it is error to allow a medical provider to subsume the parental decision-making. While ordinarily I would agree, the parenting plan goes on to assign Tim primary responsibility over all non-emergency medical care and providers. The parenting plan thus functionally assigns decision-making authority to Tim and I would not disturb that on this record.

Alihana is engaged in such harmful conduct, then the District Court should restrict the conduct. If it is impossible to prohibit the harmful conduct while still awarding Alihana partial unsupervised custody, then the District Court must fashion a parenting plan in the best interests of the children, which may mean awarding full custody to Tim. Barring that situation, this Court should follow the majority of states in allowing parents to equally expose their children to religious practice absent clear demonstrable harm to the child.

/S/ CORY J. SWANSON

Justice James Jeremiah Shea joins the Dissent of Chief Justice Cory J. Swanson.

/S/ JAMES JEREMIAH SHEA